# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| SAMSONITE COMPANY STORES, LLC,[1] | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 09-_13102_ (___) |
| | ) | |

## DECLARATION OF DONALD E. WALDEN
## IN SUPPORT OF THE CHAPTER 11 PETITION AND
## VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

**DONALD E. WALDEN**, being duly sworn, deposes and states:

1.      I am the Assistant Treasurer of Samsonite Company Stores, LLC ("Company Stores" or the "Debtor"), a limited liability company organized under the laws of Indiana and the above-captioned debtor.  I am also the Vice President, Finance and CFO of the Americas of Samsonite Corporation ("Samsonite", and together with its subsidiaries and affiliates, the "Company"), the Debtor's parent corporation. I am generally familiar with the Debtor's day-to-day operations, business affairs, books and records.

2.      On September 2, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" and the "Chapter 11 Case").  The Debtor also filed on the Petition Date a Plan of Reorganization (the "Plan") that provides for, among other things, payment in full of all of the Debtor's prepetition claims, reinstating the Debtor's guaranty

---

[1]      The last four digits of the Debtor's tax identification number are (6266) and its headquarters are located at 575 West Street, Suite 110, Mansfield, MA 02048.

of its parent's bank debt and unimpairing the Debtor's equity interests.  I am advised that the Plan does not impair any class of creditors or equity holders and thus will not require a vote to be confirmed by the Court.

3.     To minimize any adverse effects that filing for chapter 11 may have on its business, the Debtor has requested various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek to allow the Debtor to perform and meet its obligations necessary to fulfill its duties as debtor-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtor's operations and balance sheet; (c) best serves the Debtor's estate and creditors' interests; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.

4.     I submit this declaration ("Declaration") in support of the Petition and First Day Motions.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtor's industry, operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration.

5.     Part I of this Declaration describes the Debtor's business and the circumstances surrounding the commencement of the Chapter 11 Case.  Part II sets forth the relevant facts in support of the First Day Motions.

## PART I

### I.     Samsonite Corporation

6.     Samsonite is the world's leading travel brand.  The Company is the world's largest and most recognized designer and distributor of luggage and related products.  In addition to its popular luggage lines, Samsonite also produces casual and outdoor bags, business and computer cases, leather goods and travel accessories.  It sells such products principally under the labels of Samsonite, American Tourister and Samsonite Black Label.

7.     The Company sells products in more than 100 countries.  Its products are principally distributed through wholesale channels.  The Company's wholesale customers include specialty luggage stores, department stores, mass merchants, office superstores and warehouse clubs.  The remainder of wholesale sales are made through discounters and other distributors and agents.  In addition, the Company distributes its products in approximately 500 retail stores operated by the Company or its worldwide affiliates.  This includes 173 retail stores operated by the Debtor in the United States.

8.     A key component of the Company's financial success has been the continuous update of its product offerings.  Historically, Samsonite's products are replaced approximately every three years so as to maintain a contemporary brand image

and satisfy evolving customer interests. The Company holds over 1800 registered trademarks or trademark applications and over 1000 patents or patent applications.

9.     Samsonite's financial performance depends primarily on the market demand for its products. In 2006 and 2007, the Company had sales of $1.1 billion and $1.2 billion, respectively.

## II.     Samsonite Company Stores, LLC

10.     Company Stores, a wholly-owned subsidiary of Samsonite and the Debtor in this Chapter 11 Case, operates Samsonite's U.S. retail store business. As of August 31, 2009, Company Stores leased 173 retail stores in the United States (the "Retail Stores") located in 38 states. It employs approximately 650 people and had sales of $112 million and $108.1 million in 2007 and 2008, respectively. As of July 31, 2009, it had $233 million in total assets and $1.5 billion in total liabilities.[2]

11.     The Retail Stores principally carry and sell the Samsonite family of branded products, which represented 92.8% of Company Stores' total sales in 2008. However, the Debtor also has certain multi-branded stores which derive approximately half of their sales from related products by third-party manufacturers.

## III.     Purchase of the Company by CVC Capital Partners

12.     On October 24, 2007, funds managed and advised by CVC Capital Partners ("CVC"), a leading international private equity firm, acquired the Company for approximately $1.7 billion, including assumed debt (the "Acquisition"). To finance the

---

[2]    The Debtor is a guarantor under the Senior Facility (as defined below) and has pledged substantially all of its assets to secure the obligations related thereto. The Debtor intends for its guarantee to remain unaltered by the Chapter 11 Case and Plan. As of July 31, 2009 there was approximately $1.3 billion outstanding under the Senior Facility.

Acquisition, the Company entered into a Senior Facilities Agreement (the "Senior Facility"), dated as of October 23, 2007, as amended and restated from time to time, by and among several of Samsonite's affiliates and subsidiaries,[3] including the Debtor, as Borrowers and Guarantors, and the Royal Bank of Scotland, plc ("RBS") as Facility Agent.

13. The Senior Facility includes a $745 million term loan (the "Term Loan"), a $100 million acquisition facility (the "Acquisition Facility"), a $125 million revolving credit facility (the "Revolving Facility"), a $10 million swingline facility (the "Swingline Facility") and a $275 million second lien facility (the "Second Lien Facility"). Samsonite, Samsonite Europe N.V. and Vespucci Investments Sarl, a parent holding company of Samsonite, are the three Borrowers under the various credit lines that form the Senior Facility. Several of Samsonite's subsidiaries, including the Debtor, are Guarantors. The Senior Facility is secured by a first lien on substantially all of the Senior Facility Parties' assets.

## IV. Events Leading to the Commencement of the Chapter 11 Case

14. The Company has experienced significant financial difficulties since the Acquisition, due mainly to exogenous macroeconomic factors. The global economic recession of the past year has resulted in a sudden and dramatic decline in demand for travel-related consumer goods, the Company's primary product. Worldwide air traffic, mall traffic and consumer spending on discretionary products all have fallen

---

[3] The Samsonite entities party to the Senior Facility (the "Senior Facility Parties") are: Vespucci Sub Finance Sarl, Vespucci Investments Sarl, Samsonite LLC, Samsonite Europe N.V., C.V. Holdings, LLC, Samsonite Pacific LLC, Samsonite Company Stores, LLC, Global Licensing Company, LLC, Direct Marketing Ventures, LLC, and McGregor II, LLC.

considerably from prior years. As a result, the Company's sales, revenue and margins have all deteriorated, thereby significantly impairing the Company's liquidity. Additionally, several of the Company's operational initiatives, including the expansion of the Debtor's U.S. retail store presence, with a particular emphasis on adding "full price" store locations, as opposed to "outlet" center stores, have failed to meet revenue and profitability expectations. In an effort to right-size the Company's operations and rejuvenate growth, the Company engaged in numerous cost-cutting initiatives to protect the Company's dwindling cash reserves. These initiatives have included, among other things, work force reductions and store closures.

15.     Despite these significant efforts to manage cash and improve liquidity, the Company's financial stability has continued to deteriorate. As the Company entered 2009, it became readily apparent that it would not have sufficient cash flow to fund its operations, including significant debt service costs, without a restructuring of its business and balance sheet. As a result, the Company engaged its primary stakeholders, CVC and RBS, in negotiations to effectuate a global restructuring of the Company's capital structure and balance sheet. Since March 2009, the Company and RBS have entered into several forbearance agreements on account of the Company's inability to service its existing debt obligations under the Senior Facility. After months of good faith and arm's-length discussions, the parties recently agreed to a fully consensual out-of-court global restructuring (the "Global Restructuring Agreement") that will significantly reduce the Company's outstanding indebtedness, resulting in a de-leveraging of the Company's balance sheet, while providing sufficient liquidity to meet its projected long term cash needs.

16.     The filing of the Chapter 11 Case for only the Company Stores entity is a condition to and integral part of this much larger consensual worldwide restructuring of the Company's operations and balance sheet.  With the support of RBS and CVC, the Debtor determined that this filing was necessary to refocus the Debtor's unprofitable U.S. retail store business on profitable "outlet" stores.  As noted above, the significant expansion of the number of the Company's U.S. retail stores was one of the growth initiatives that failed to meet revenue and profitability expectations.  The Debtor undertook an extensive analysis of the costs and benefits of its current number and type of retail store locations and concluded that a significant number of stores would likely remain unprofitable for several years.  Specifically, and as noted below, the Debtor intends to reject as many as 84 store leases (the "Rejected Stores"), thereby decreasing the total number of the Debtor's U.S. retail stores by approximately 47%.  The Debtor estimates that exiting from the Rejected Stores will result in an annual run-rate improvement in EBITDA estimated at $5.3 million at current sales levels.  Exiting from these stores will also eliminate a significant drain on the Debtor's liquidity, thereby allowing it to focus its capital and management resources on profitable growth initiatives.

17.     For each of the Rejected Stores, the Debtor considered the location's historical performance and costs, as well as projections related to the same.  Contemporaneously with evaluating the viability of continuing operations at these stores, the Debtor hired Hilco Real Estate, LLC ("Hilco Real Estate") as special real estate advisor in order to help the Debtor negotiate with many of the Rejected Stores' landlords.  Despite the Debtor's and Hilco Real Estate's best efforts, these negotiations proved unsuccessful.  After extensive deliberations, the Debtor determined that the filing of this

Chapter 11 Case is the Debtor's best opportunity to streamline its operations and successfully and comprehensively reorganize its business affairs in an effort to maximize value for the benefit of the Debtor's collective stakeholders.

18.     As mentioned above, this Chapter 11 Case is just one component of a significant restructuring of the Company's worldwide operations and balance sheet. As a result, the Company will significantly reduce its outstanding indebtedness while increasing its available liquidity, thereby ensuring that the Company will be able to weather the current downturn in the global economy and the market for its goods. This chapter 11 filing of only the Company Stores entity will not materially impact the Company's or the Debtor's ongoing operations. The Company does not anticipate that any of its customers or suppliers will be materially affected by this filing. Samsonite's product warranties and customer programs will still be honored to the same extent they were before the chapter 11 filing.

## PART II[4]

19.     To minimize the adverse effects on its business of seeking protection under chapter 11, the Debtor has requested various types of relief in the following First Day Motions, all of which are being filed concurrently with this Declaration. For the reasons discussed below, I believe that the relief requested in each of the First Day Motions is necessary and appropriate and is in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

---

[4]     Capitalized terms used and not defined herein shall have the meaning ascribed to them in the applicable first day motion.

## I.    Administrative Motions

### A.    Debtor's Application to Employ and Retain Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent for the Debtor and Debtor-In-Possession

20.    By this Application, the Debtor seeks to retain and employ Epiq Bankruptcy Solutions ("Epiq") as Notices and Claims Agent for the Chapter 11 Case. I have been informed that the numerous creditors and other parties-in-interest in this Chapter 11 Case may impose a heavy administrative burden on the Court and the Office of the Clerk of the Court (the "Clerk's Office"). To relieve the Clerk's Office of these burdens, the Debtor seeks an order appointing Epiq as the notice and claims agent to, among other things, prepare and serve required notices in the Chapter 11 Case. The Debtor selected Epiq because of its extensive experience performing these tasks in cases of this size. I believe that Epiq is well qualified to perform the services contemplated in its retention application.

### B.    Debtor's Motion for an Order: (I) Scheduling a Combined Hearing to Approve the Adequacy of the Disclosure Statement and Confirm the Plan of Reorganization, (II) Establishing Deadlines and Procedures for Filing Objections to the Approval of the Disclosure Statement or Confirmation of the Plan, (III) Directing the Office of the United States Trustee not to Convene a Meeting of Creditors or Equity Security Holders and (IV) Approving the Form and Manner of Notice of the Confirmation Hearing

21.    By this motion, the Debtor seeks entry of an order: (i) scheduling the Confirmation Hearing to approve the adequacy of the information contained in the Disclosure Statement and consider confirmation of the Plan, (ii) establishing deadlines and procedures for filing objections to approval of the Disclosure Statement or confirmation of the Plan, (iii) directing the U.S. Trustee not to convene a 341 Meeting, unless otherwise ordered by the Court, if the Plan is confirmed within 90 days after the

Petition Date and (iv) approving the form and manner of notice of the commencement of the Chapter 11 Case and the scheduling of the Confirmation Hearing.

22.     In connection with the Plan, the Debtor prepared the Disclosure Statement describing, among other things, the Debtor's proposed reorganization and its effects on holders of claims against and interests in the Debtor. As no holders of any claims against or interests in the Debtor will be impaired under the Plan, I am advised that there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Plan.

23.     The Debtor believes that the Scheduling Order should be entered at this time so that creditors and equity holders may be informed as promptly as possible of the anticipated scheduling of events preceding confirmation of the Plan. Further, the Debtor believes that the proposed schedule affords creditors and equity interest holders ample notice of the important events in the case. I have been advised that because there are no impaired classes of claims or interests under the Plan, and because all parties-in-interest will have notice and an opportunity to obtain a copy of the Plan and Disclosure Statement over twenty-five (25) days prior to the proposed deadline for objections, no party will be prejudiced by the relief requested herein.

24.     The most complex tasks required to effectuate a successful reorganization in the Chapter 11 Case have been accomplished prior to the Petition Date, and therefore I believe the circumstances weigh heavily in favor of scheduling the Confirmation Hearing on the earliest date convenient for the Court after the applicable notice periods, and that the relief requested herein is necessary and appropriate and in the best interests of the Debtor, its estate and all parties-in-interest.

## II. Professional Retention Applications

### A. Debtor's Application for an Order Authorizing the Retention and Employment of Paul, Weiss, Rifkind, Wharton & Garrison LLP as Attorneys for the Debtor and Debtor-In-Possession *Nunc Pro Tunc* to the Petition Date

25. By this Application, the Debtor seeks to retain and employ the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as its attorneys for the Chapter 11 Case. The Debtor has determined that it will be necessary to engage counsel with knowledge and experience in bankruptcy, financial restructuring, litigation, cross-border restructurings, employee benefits and general corporate law. Such counsel will enable the Debtor to carry out its duties in this Chapter 11 Case and to assist in the reorganization of the Debtor's estate. Consequently, the Debtor seeks to retain and employ the law firm of Paul Weiss as counsel in this Chapter 11 Case. Subject to further order of this Court, Paul Weiss will render services in connection with:

    a. advising the Debtor with respect to its powers and duties as debtor and debtor-in-possession in the continued management and operation of its business and properties;

    b. attending meetings and negotiating with representatives of creditors and other parties in interest and advising and consulting on the conduct of the case, including all of the legal and administrative requirements of operating in chapter 11;

    c. taking all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions commenced under the Bankruptcy Code on its behalf, and objections to claims filed against the estate;

    d. preparing and prosecuting on behalf of the Debtor all motions, applications, answers, orders, reports and papers necessary to the administration of the estate;

    e. negotiating and preparing on the Debtor's behalf chapter 11 plan(s), disclosure statement(s) and all related agreements and/or documents and taking any necessary action on behalf of the Debtor to obtain confirmation of such plan(s);

f.    appearing before this Court, and any appellate courts, and protecting the interests of the Debtor's estate before such courts; and

g.    performing all other legal services in connection with the Chapter 11 Case as requested by the Debtor and without duplication of other professionals' services.

26.    Paul Weiss has provided legal services to Samsonite and its affiliates, including the Debtor, in a variety of matters since CVC's acquisition of Samsonite in 2007. The Debtor has selected Paul Weiss to serve as its counsel in the Chapter 11 Case because of the firm's knowledge of the Debtor, its affiliated entities and other stakeholders, as well as the firm's extensive experience and knowledge in the field of business reorganizations under chapter 11 of the Bankruptcy Code. I believe Paul Weiss is well qualified to represent the Debtor in this Chapter 11 Case in a timely and efficient manner.

27.    I have been informed that Paul Weiss does not hold or represent any interest adverse to the Debtor or its estate and that Paul Weiss is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and I believe Paul Weiss's employment and retention is necessary and in the best interests of the Debtor and its estate. Except as set forth in the Saferstein Affidavit attached to the Paul Weiss Retention Application, I understand that the partners, counsel and associates of Paul Weiss have not represented, and do not have any connection with, the Debtor, its creditors, equity security holders or any other parties in interest in any matters relating to the Debtor or its estate. I have been informed that Paul Weiss is currently representing, or has represented in the past, certain of the Debtor's creditors, equity holders and other parties-in-interest in matters wholly unrelated to this Chapter 11 Case. I believe that Paul Weiss's current and past

representations of these entities will not adversely affect the firm's representation of the Debtor.

      B.    <u>Debtor's Application for an Order Authorizing the Retention and Employment of Young Conaway Stargatt & Taylor, LLP as Attorneys for the Debtor and Debtor-In-Possession *Nunc Pro Tunc* to the Petition Date</u>

      28.    By this Application, the Debtor seeks to retain Young Conaway Stargatt & Taylor, LLP ("<u>Young Conaway</u>") as Delaware counsel for the Debtor *nunc pro tunc* to the Petition Date. The Debtor seeks to retain Young Conaway because of the firm's extensive experience and knowledge in the fields of debtors' and creditors' rights, business reorganizations under chapter 11 of the Bankruptcy Code and general litigation and corporate law, and because of its expertise in practicing before this Court. I believe Young Conaway, in consultation with Paul Weiss, is well qualified to deal effectively with the potential legal issues and problems that may arise in the context of this Chapter 11 Case. I have been informed that Young Conaway will collaborate with Paul Weiss to ensure that they do not duplicate their efforts, and that all legal services are provided in an efficient and cost-effective manner. I believe that the services of Young Conaway are necessary and essential to enable the Debtor to execute faithfully its duties as debtor-in-possession.

      C.    <u>Debtor's Application for an Order Authorizing the Employment and Retention of Hilco Real Estate, LLC as Real Estate Consultant for the Debtor and Debtor-in-Possession *Nunc Pro Tunc* to the Petition Date</u>

      29.    By this Application, the Debtor seeks to retain Hilco Real Estate, LLC, an affiliate of Hilco Merchant Resources, LLC, as special real estate consultant to the Debtor. As set forth above, a critical element of this Chapter 11 Case is the elimination of the Rejected Stores from the Debtor's leasehold portfolio resulting in a substantial annual run-rate improvement in EBITDA. In order to assist the Debtor in

reducing the current costs of its lease portfolio, Hilco Real Estate will provide the Debtor with the following services:

a. Meet with the Debtor to ascertain the Debtor's goals, objectives and financial parameters;

b. Mutually agree with the Debtor with respect to a strategic plan for the restructuring, sale, assignment, subleasing or termination of each Lease (the "Strategic Plan");

c. On the Debtor's behalf, negotiate more favorable lease terms with the landlords under certain of the Leases, in accordance with the Strategic Plan;

d. On the Debtor's behalf, negotiate the terms of agreements for the termination, assignment or subleasing of the Leases, in accordance with the Strategic Plan;

e. Negotiate waivers or reductions of prepetition cure amounts and Bankruptcy Code § 502(b)(6) claims with respect to Leases in accordance with the Strategic Plan;

f. Assist the Debtor at an auction for the Leases, as needed;

g. Provide weekly written reports to the Debtor regarding the status of its negotiations with the landlords; and

h. Assist the Debtor in closing the pertinent Lease restructuring, sale, termination, assignment or subleasing agreements contemplated under the Debtor's agreement with Hilco Real Estate.

30. The Debtor has been working with Hilco Real Estate since January 2009. I believe that Hilco Real Estate's familiarity with the Debtor as well as the firm's extensive experience providing real estate consulting service to companies both in and out of chapter 11 make Hilco Real Estate an excellent candidate to serve as the Debtor's real estate consultant in the Chapter 11 Case. I have been informed that Hilco Real Estate does not hold or represent any interest adverse to the Debtor or its estate and that Hilco Real Estate is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and I

believe Hilco Real Estate's employment and retention is necessary and in the best interests of the Debtor and its estate.

## III.  Motions Related to the Debtor's Operations in Chapter 11

A.  <u>Debtor's Motion for Interim and Final Orders (I) Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (B) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 and (II) Scheduling a Final Hearing</u>

31.     By this Motion, the Debtor seeks entry of an Interim Order (i) authorizing the Debtor's use of Cash Collateral; (ii) providing adequate protection to the Debtor's Senior Facility Lenders for any diminution in value of their respective interests in the Cash Collateral and other Prepetition Collateral; (iii) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and (iv) scheduling a Final Hearing to consider the relief requested in the Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing.

32.     The Debtor believes, and I agree, that the adequate protection provided to the Senior Facility Lenders, including replacement liens and superpriority administrative expense claims, is necessary and appropriate to ensure that the Debtor can continue to use Cash Collateral during the Chapter 11 Case. Accordingly, the adequate protection is fair and reasonable and sufficient to satisfy the requirements of section 363(c) and (e) of the Bankruptcy Code, as they have been explained to me. The Debtor requires use of Cash Collateral to fund its operating expenses and provide working capital for its ongoing business. The Debtor's limited cash on hand, collections on accounts receivables and the proceeds from the sales of inventory are the Debtor's only source of funds from which to pay operating expenses, and all are subject to the

Prepetition Liens of the Senior Facility Lenders. Therefore, the Debtor's ability to use Cash Collateral is essential to the Debtor's business and a successful reorganization. Unless the Court authorizes use of Cash Collateral, the Debtor will be unable to pay for services and expenses necessary to preserve and maximize the value of its assets, and will need to immediately cease operations, close its stores and terminate the employment of its employees. This would significantly impair creditors' recovery in the Debtor's bankruptcy case. Moreover, the Senior Facility Lenders have consented to the Debtor's use of Cash Collateral, subject to the terms and conditions of the Interim Order.

33. Accordingly, I believe the use of cash collateral is in the best interests of the Debtor, its estate, and all parties-in-interest, and will enable the Debtor to continue its operations and fund its obligations during the pendency of the Chapter 11 Case.

B. Debtor's Motion for an order Authorizing, but not Directing, the Debtor to Pay Prepetition Claims as they Come Due

34. By this Motion, the Debtor requests authority to honor and pay, in the ordinary course, the prepetition claims of its general creditors (collectively, the "General Creditors", and the claims, the "General Prepetition Claims"), which shall exclude intercompany claims of Samsonite and employee wage and benefits related claims. Among other things, the General Creditors are: (i) the landlords at each of the Debtor's retail stores (the "Retail Stores"), (ii) the providers of utility, maintenance and other services necessary to maintain daily operations at the Retail Stores, (iii) contractors performing repair, build out and maintenance work at the Retail Stores, (iv) lessors of personal property, (v) vendors providing the Debtor with third-party finished products for sale, (vi) vendors providing signage, sales tags, packaging and other supplies used in the

marketing and sale of the Debtor's luggage and other travel related products, and (vii) vendors providing store-level and corporate services supporting the Debtor's sales efforts, such as advertising, point-of-sale systems, check and credit card processing and database programming. The Debtor is seeking authority to satisfy the General Prepetition Claims up to an aggregate amount of $1,900,000 and to authorize banks and other financial institutions to honor and process checks and electronic payment requests related to such payments.

35.     The Debtor's retail operations are highly dependent on the continued supply of goods and services from the General Creditors. Any disruption in the supply of those goods and services during this case would have a detrimental impact on the success of the Debtor's reorganization efforts. The Debtor believes that satisfaction of the General Prepetition Claims in the ordinary course of business will ensure continuing business relationships with the Debtor's vendors and mitigate the risk of such vendors taking any adverse action to enforce or collect on their prepetition claims. I also believe that satisfaction of the General Prepetition Claims will maintain the favorable aspects of the Debtor's existing business relationships, including the Debtor's ability to receive a continued supply of goods and services and favorable trade credit currently provided by the General Creditors, benefiting the estate and its creditors. Moreover, because the Plan proposes to pay all unsecured creditors in full, I believe the relief requested in the Motion affects only the timing of when claims will be satisfied.

36.     I believe that the payment of the General Prepetition Claims in the ordinary course will mitigate the potential risks of disruption in the supply of goods and services that are necessary to the Debtor's successful reorganization, thereby provided a

substantial benefit to the Debtor's estate. Accordingly, I believe that granting the relief requested in the Motion is a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

C.  Debtor's Motion for an Order (A) Authorizing the Assumption of the Agency Agreement Between the Debtor and Hilco Merchant Resources, LLC and (B) Authorizing the Debtor to Conduct Store Closure Sales

37.  By this Motion, the Debtor seeks entry of an order authorizing the assumption of the Agency Agreement between the Debtor and Hilco Merchant Resources, LLC ("Hilco") and authorizing the Debtor and Hilco to conduct the Store Closing Sales. Pursuant to the terms of the Agency Agreement, Hilco will serve as the Debtor's exclusive agent in conducting the Store Closing Sales at certain of the Debtor's retail stores and distribution centers. The significant terms of the Agency Agreement are as follows:

(i)  Services: Hilco shall serve as the Debtor's exclusive agent for conducting the Sale and disposing of the Assets, in accordance with the terms and conditions of the Agency Agreement.

(ii)  Guaranteed Amount: Hilco will guarantee the Debtor a minimum recovery of 105% (the "Guaranteed Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"). The Guaranteed Percentage shall be reduced by one and one half percent (1.5%) to the extent the Approval Order is not entered by September 11, 2009. To the extent the Proceeds of the Sale exceed the sum of the Guaranteed Amount, Expenses of the Sale and 6% of the Cost Value of the Merchandise (the "Sharing Threshold"), then all remaining Proceeds shall be shared sixty percent (60%) to the Debtor and forty percent (40%) to Hilco (the "Recovery Amount").

(iii)  Compensation to Hilco: Hilco shall be entitled to all Proceeds of the Sale after payment of the Guaranteed Amount, the Expenses of the Sale, the Recovery Amount, if any, and any other amounts payable to the Debtor from Proceeds of the Sale. Any Merchandise remaining after the Sale Termination Date shall become property of Hilco, free and clear of all liens, claims and encumbrances, and the proceeds received by Hilco from the disposition of such unsold Merchandise shall be considered Proceeds from the Store Closing Sales.

(iv)    Payment:  No later than one (1) business day after the later of entry of the Approval Order and execution of the Agency Agreement, Hilco shall pay the Debtor eighty percent (80%) of the Guaranteed Amount.  Hilco shall pay the Debtor the unpaid and undisputed balance of the Guaranteed Amount no later than the earlier of (i) the date that is thirty (30) business days after the Sale Commencement Date and (ii) the second business day following the issuance of the audit report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service.

(v)     Sale Term:  The Sale shall commence at the Stores on the first calendar day following issuance of the Approval Order, but in no event later than September 18, 2009.  Hilco shall complete the Sale at the Stores, and shall vacate all of the Store premises on or before November 30, 2009 unless the Sale is extended by mutual agreement of Hilco and the Debtor, provided that Hilco may terminate the Sale at any retail store location upon five (5) days' written notice to the Debtor.

(vi)    Terms of Sales to Customers:

        (a)    Final/As Is Sales - All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same.  Hilco shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash and nationally recognized bank credit cards.

        (b)    Gift Certificates - Hilco will accept the Debtor's gift certificates and Store credits, issued by the Debtor prior to the Sale Commencement Date, and honor other customer programs required by the Sale Guidelines, including but not limited to all customer satisfaction programs for items purchased prior to the commencement of the Sale as authorized by the Bankruptcy Court (including, but not limited to, acceptance of gift certificates, honoring of customer deposits, and subject to Section 8.5 of the Agency Agreement, granting of refunds for items purchased prior to the commencement of the Sale), to the extent that such programs were in effect at the time the items were purchased by such customers, provided that Hilco shall be reimbursed by the Debtor in connection with the Sale reconciliation contemplated under Section 5.2 of the Agency Agreement on a dollar for dollar basis for any such programs honored by Hilco.

(vii)   Store Closing Sale Expenses:  Hilco shall be unconditionally responsible for all Expenses incurred during the Sale.  Hilco will be responsible for the

payment of all Expenses whether or not there are sufficient Proceeds collected to pay such Expenses after payment of the Guaranteed Amount. To secure payment of the Expenses, Hilco shall deliver to the Debtor an irrevocable and unconditional standby letter of credit, naming the Debtor as beneficiary, in the original face amount equal to two (2) weeks' estimated Expenses.

(viii) Conduct of the Sale: Hilco shall be permitted to conduct the Sale in accordance with the Sale Guidelines. In addition to any other rights granted to Hilco under the Agency Agreement, in conducting the Sale, Hilco, in the exercise of its sole discretion, shall have the right, limited only by the Sale Guidelines:

    (a)    to establish and implement advertising and promotion programs consistent with a "store closing", "sale on everything", "everything must go", or similar theme (including, without limitation, by means of media advertising, A-frame, similar interior and exterior signs and banners, and use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order;

    (b)    to establish Store hours that are consistent with the terms of applicable leases, and local laws and regulations, including without limitation Sunday closing laws;

    (c)    except as otherwise expressly included in an Expense, to use without charge during the Sale Term all FF&E, advertising materials, computer hardware and software, existing supplies located at the Stores, intangible assets (including the Debtor's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Debtor located at the Stores (whether owned, leased, or licensed);

    (d)    to use the Debtor's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale during the Debtor's normal business hours; provided, however, that in the event that Hilco expressly requests the Debtor to provide services other than those normally provided in liquidations such as this to the Stores and relating to the sale of Merchandise by the Debtor, Hilco shall be responsible for the actual incremental cost of such services as an Expense. Hilco shall exercise due care and return to the Debtor immediately at the end of the Sale

all materials and supplies except materials and supplies expended; and

(e)     to transfer Merchandise between and among the Stores, the costs of which shall be paid by Hilco as an Expense of the Sale; provided, however, Hilco shall not transfer Merchandise between Inventoried Stores unless the Inventory Taking at the transferring and receiving Inventoried Stores has been completed.

(ix)    Security Interest:  Hilco will have, effective as of the Payment Date, a valid and perfected first priority security interest in and lien upon the Merchandise, Hilco's disposition commission related to Owned FF&E, Hilco's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds to secure all obligations of the Debtor to Hilco thereunder, junior only to (a) an amount equal to the unpaid portion of the Guaranteed Amount, (b) any amount owed by Hilco to the Debtor for Expenses (c) the Recovery Amount, and (d) any other amounts owed by Hilco to the Debtor thereunder.  Such security interest shall be valid and perfected without the necessity of filing financing statements to perfect the security interests.  The Debtor shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest.

38.     I believe entering into the Agency Agreement and conducting the Store Closing Sales is the best way to maximize the Debtor's recovery on the sale of the Assets.  Prior to entering into the Agency Agreement, the Debtor considered and weighed various alternatives, and in the exercise of its sound business judgment concluded that the Agency Agreement offered the best recovery for its collective stakeholders.

39.     I believe that any failure by the Debtor to continue performing pursuant to the Agency Agreement would in all likelihood lead only to unnecessary delay and expense that would, in turn, disrupt the Debtor's otherwise streamlined reorganization efforts.  Among other things, the Debtor and its advisors would have to devote valuable time and effort, at considerable expense to the Debtor and its estate, to locate a new agent to conduct the Store Closing Sales.  Given the quick timeline within which the Debtor hopes to conclude the Store Closing Sales and exit from the Chapter 11

Case, it is unlikely that an alternative agent could be found at this stage to undertake the Store Closing Sales on an uninterrupted basis. This would inevitably result in a disruption of the Store Closing Sales and, in all likelihood, a decrease in the Debtor's recovery from the sale of the Assets.

40.     Furthermore, I believe that sufficient cause exists for the Court to authorize assumption of the Agency Agreement, and the transactions contained therein, on an expedited basis. The Debtor will suffer immediate, substantial and irreparable harm if the relief requested is not granted on or before September 11, 2009. Pursuant to section 3.1 of the Agency Agreement, the Guaranty Percentage – the percent of the Cost Value of the Merchandise that Hilco pays the Debtor – will be reduced by 1.5% if the Approval Order is not entered on or before September 11, 2009, thereby directly reducing the Debtor's recovery on the Store Closing Sales.

41.     Further, any delay in starting the Store Closing Sales will impact Hilco's ability to complete the sales by the Sale Termination Date of November 30, 2009. If the Store Closing Sales are not completed prior to November 30, 2009, then such a delay would have a significant deleterious impact on the Debtor's holiday season sales at its other retail stores that will not be closing. In addition, announcing the Store Closing Sales, but delaying the commencement of such sales, may create unnecessary uncertainty that could impair the Debtor's ability to retain its employees at the Closing Stores and increase the Debtor's exposure to inventory "shrink" in the Closing Stores, which may impact certain inventory thresholds required under the Agency Agreement.

42.     In contrast to the harm that any failure to commence the Store Closing Sales before September 11th would undoubtedly cause the Debtor and its estate,

I believe that the Debtor will receive significant benefits from commencing the Store Closing Sales before such date. Allowing Hilco to quickly commence the Store Closing Sales will ensure that (i) the Debtor obtains the maximum recovery on the sale of the Assets, (ii) the Closing Stores will be closed prior to November 30, 2009, thereby avoiding any competition between Closing Stores and go-forward stores in December, a critical retail month, and (iii) will increase the Debtor's likelihood of achieving the Recovery Amount under the Agency Agreement.

        43.     Accordingly, I believe the relief requested in the Motion is in the best interests of the Debtor, its creditors and all parties-in-interest and is necessary to avoid immediate and irreparable harm to the Debtor's estate and should be granted on an expedited basis.

        D.     <u>Debtor's Motion for an Order (A) Authorizing, but not Directing, the Debtor to Pay Certain Prepetition: (i) Wages, Salaries and other Compensation; (ii) Employees Business Expenses; (iii) Contributions to Employee Benefit Programs and to Continue Such Programs in the Ordinary Course; and (iv) Payroll Withholdings and Related Deductions and Payments; and (B) Authorizing and Directing Financial Institutions to Honor and Pay all Checks and Transfers on the Debtor's Accounts Related to the Foregoing.</u>

        44.     By this Motion, the Debtor seeks entry of an order (A) authorizing, but not directing, the Debtor to pay certain prepetition: (i) wages, salaries and other compensation; (ii) employee business expenses; (iii) contributions to employee benefit programs and to continue such programs in the ordinary course; and (iv) payroll withholding and related deductions and payments; and (B) authorizing and directing banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtor's or Samsonite Corporation's accounts related to the foregoing.

45.     The Debtor's employees constitute its most valuable asset and are essential to the Debtor's business and ongoing operations.  Absent an order granting the requested relief, many employees will suffer undue hardship and, in many instances, face serious financial difficulties.

46.     As explained in greater detail below in relation to the Cash Management Motion, as part of Samsonite's integrated cash management system, Samsonite directly funds many of the Debtor's operating expenses, including its Wages and Employee Benefits.  Samsonite then allocates these expenses to the Debtor as an Intercompany Claim.  This intercompany funding arrangement greatly benefits the Debtor, in many instances providing more advantageous pricing than the Debtor would otherwise be able to obtain, and the Debtor has requested authority to continue such practices postpetition.  Accordingly, though the Debtor does not directly make many of the payments related to employee wages and benefits, the Debtor is requesting authority for such payments to be made on its behalf by Samsonite, consistent with the Debtor's and Samsonite's prior practices, and to allow Samsonite to create an intercompany claim in connection with any such payments.

47.     The Debtor employs approximately 650 employees (each an "Employee" and collectively, the "Employees"), the majority of which are paid on an hourly basis.  The Employees' skills, knowledge and understanding of the Debtor's business are among its most valuable assets and are critical for a successful reorganization.

*(i)    Wages, Salaries and Other Compensation*

48.    The Debtor's average gross monthly compensation for Employees, including wages, salaries and other compensation, totals approximately $1,241,000 ("<u>Wages</u>"). The Debtor pays most of its Employees via direct deposit.

49.    The Debtor pays its Employees bi-weekly. Hourly Employees are paid one week in arrears, while salaried Employees are paid on a current basis. The Company employs a third-party processor, Automatic Data Processing, Inc., to manage and oversee the payment of all of the Company's wages, including the Debtor's.

50.    As of the Petition Date, the Debtor estimates, and I concur, that the aggregate amount of accrued Employee Wages (excluding Payroll Taxes and Deductions, as defined below) earned prior to the Petition Date that remain unpaid totals approximately $375,000, (the "<u>Unpaid Wages</u>"). Based upon a thorough review of its books and records, the Debtor believes, and I concur, that no individual Employee is owed more than $10,950 for Unpaid Wages as of the Petition Date.

*(ii)    Employee Business Expenses*

51.    In the ordinary course of its business, the Debtor reimburses its Employees for certain expenses the Employees incur on behalf of the Debtor in the scope of their employment (the "<u>Reimbursable Expenses</u>"). The Reimbursable Expenses typically include expenses for air travel, lodging, ground transportation, meals and other similar charges.

52.    Because Employees do not always submit expense reports on a regular basis, it is difficult to determine precisely the aggregate amount of outstanding Reimbursable Expenses at any given time. Based on historical payments, the Debtor

estimates, and I concur, that as of the Petition Date, no more than $31,000 in Reimbursable Expenses have been incurred and remain unpaid.

53.     The Employees incurred all of the Reimbursable Expenses on the Debtor's behalf and with the understanding that they would be reimbursed.  To avoid harming the individual Employees who have incurred such costs, the Debtor requests authority to pay the Reimbursable Expenses, including paying any and all unpaid Reimbursable Expenses that accrued prepetition or relate to the prepetition period.

(iii)     *Prepetition Withholdings and Deductions*

54.     The Debtor is required by law to (i) withhold from an Employee's Wages amounts related to, among other things, federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state and local taxing authorities and (ii) make certain matching payments for Social Security and Medicare Taxes, and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, the "Payroll Taxes").  The Payroll Taxes, including both the employee and employer portion, average approximately $400,000 per month.  As of the Petition Date, the Debtor believes, and I concur, that approximately $400,000 in accrued and outstanding prepetition obligations with respect to Payroll Taxes were outstanding.

55.     During each applicable pay period, the Debtor also routinely deducts other amounts from certain of its Employees' paychecks, including, but not limited to, (a) garnishments, child support and similar deductions, (b) pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below (*e.g.*, an Employee's share of pension payments, health care benefits, insurance

premiums, 401(k) contributions), and (c) other miscellaneous deductions (collectively, the "Deductions") and forwards those amounts to various third party recipients. As of the Petition Date, the Debtor does not believe that there are any Deductions which have not yet been processed and forwarded to the appropriate third party recipient. Nevertheless, to the extent the Debtor subsequently uncovers any such Deductions, the Debtor seeks authority to forward these prepetition Deductions to the applicable third-party recipients.

*(iv)    Health Care Programs*

56.    The Debtor offers several benefit programs to its Employees for medical, dental, disability, accidental death and dismemberment and life insurance coverage (the "Health Care Programs"). The Health Care Programs are funded through contributions by both the Debtor and its Employees.

57.    On average, the Debtor pays approximately $280,000 per month for the Health Care Programs. As of the Petition Date, approximately $310,000 of accrued and unpaid prepetition obligations with respect to the Health Care Programs was outstanding.

58.    By this Motion, the Debtor seeks authority to: (a) continue to provide the Health Care Programs for its Employees in the ordinary course of business; (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts owed under the Health Care Program to the extent that they remain unpaid as of the Petition Date.

*(v)    Workers' Compensation*

59.    The Debtor is required under various state laws to maintain workers' compensation policies and programs (collectively, the "Workers' Compensation

Programs") to provide its Employees with compensation for injuries arising from or related to their employment with the Debtor (the "Workers' Compensation Claims"). As of the Petition Date, there are no Workers' Compensation Claims pending against the Debtor. Samsonite pays approximately $465,000 per year for insurance policies related to the Workers' Compensation Programs. As of the Petition Date, these insurance policies were fully pre-paid and there were no amounts owed and outstanding.

(vi)   *Vacation, Sick, Holiday and Leave Benefits*

60.    The Debtor provides its Employees with various forms of paid time-off benefits, including vacation time, sick days, holidays and personal leave (collectively, "Paid Leave"). The amount of Paid Leave varies based on the Employee's seniority and classification. The Debtor seeks authority to continue to provide Paid Leave to its Employees in the ordinary course of business.

(vii)  *401(k) Plans*

61.    The Debtor offers a 401(k) Plan (the "401(k) Plan") to certain of its Employees. The 401(k) Plan generally allows participants to make automatic pre-tax salary deductions of eligible compensation up to limits set by the Internal Revenue Code and provides for the Debtor to make matching contributions for participating Employees up to certain amounts. As of the Petition Date, the Debtor estimates, and I concur, that the amount of accrued and unpaid matching contributions owing for the benefit of Employees under the 401(k) Plan is approximately $6,000.

(viii) *Miscellaneous Benefit Programs*

62.    In addition to the employee benefit plans described above, the Debtor is currently aware of and may discover other *de minimis* prepetition obligations

owed with respect to its Employees (the "Miscellaneous Benefit Programs").  For example, the Debtor offers an Employee Assistance Program that provides employee counseling for mental health and well-being issues.  The Debtor also offers Flexible Spending Accounts that allow its employees to use pre-tax dollars to fund certain medical expenses.  As of the Petition Date, the Debtor estimates that the amount of accrued and unpaid obligations owing for the benefit of Employees under the Miscellaneous Benefit Programs is approximately $10,000.

63.     As noted above, I believe the Employees are the Debtor's most valuable asset, and their continued loyalty and productivity are essential to the Debtor's successful reorganization.  I believe the relief requested in this Motion is essential to ensuring that the Employees do not suffer undue personal hardship.  Accordingly, I believe the relief requested in this motion is in the best interests of the Debtor, its creditors and all parties-in-interest and is necessary to avoid immediate and irreparable harm to the Debtor's estate.

E.     Debtor's Motion for an Order Authorizing, but not Directing, the Payment of Certain Prepetition Sales, Use, Franchise and Property Taxes, Licensing Fees and Similar Obligations

64.     By this Motion, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to pay certain accrued prepetition Taxes (as defined below) to the relevant Taxing Authorities (as defined below).  In the ordinary course of its business, the Debtor incurs:  (a) certain sales, use, franchise, real and personal property taxes; (b) fees for licenses and reporting; and (c) other similar charges and assessments (collectively, the "Taxes") that are payable directly to various state and local taxing authorities (collectively, the "Taxing Authorities") as such payments become due.

65.     Though the Debtor's records reflect that they are current on all of the Taxes that were required to be paid as of the Petition Date, there may be certain Taxes that accrued as of the Petition Date, but will not become due until some date after, and therefore remain unpaid. The Debtor estimates, and I concur, that the total amount of prepetition Taxes payable to the Taxing Authorities as of the Petition Date is approximately $680,000 (excluding any additional tax liabilities that may arise as the result of an audit).

66.     I have been advised that there are numerous grounds supporting the payment of the Taxes to the Taxing Authorities, including that certain of the Taxes may be "trust fund" taxes that the Debtor has collected from its customers for the benefit of the Taxing Authorities, and thus do not constitute property of the Debtor's estate. Additionally, I have been advised that, to the extent the Debtor incurred sales and use taxes prior to the Petition Date that remain unpaid, the Taxing Authorities could subject the Debtor's responsible officers to lawsuits or criminal prosecution during the pendency of the Chapter 11 Case. The threat of a lawsuit or criminal indictment, and any ensuing liability, would distract the Debtor's personnel at this most critical juncture in the Chapter 11 Case, to the detriment of all parties-in-interest. The dedicated and active participation of the Debtor's directors, officers and employees is integral to the Debtor's operations and essential to the orderly administration of this Chapter 11 Case.

67.     I can attest that the Debtor has determined, in exercise of its sound business judgment, that paying the prepetition Taxes is in the best interests of its estate, its creditors, and all other parties-in-interest and that a failure to pay such prepetition Taxes could have a material adverse effect on their operations. Prompt and regular

payment of the prepetition taxes would avoid unnecessary governmental actions that may distract the Debtor's employees and otherwise hinder the orderly administration of the Chapter 11 Case.

F.    Debtor's Motion for an Order: (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services to the Debtor; (B) Deeming Utilities Adequately Assured of Future Performance; (C) Establishing Procedures to Determine Requests for Adequate Assurance of Payment; and (D) Setting a Final Hearing Related Thereto

68.    By this Motion, the Debtor seeks entry of an interim order: (A) prohibiting the Debtor's Utilities (as defined below) from altering, refusing, or discontinuing utility service to the Debtor; (B) deeming the Debtor's Utilities adequately assured of future performance; (C) establishing procedures for determining requests for adequate assurance of payment by the Debtor's Utilities; and (D) setting a final hearing related thereto.

69.    In the ordinary course of its business, the Debtor contracts with and relies upon a number of different kinds of utilities, including, among others, electricity, water, sewer service, gas, local and long-distance telephone service, data service, fiber transmission, waste disposal and other similar services (the "Utility Services"). The Utility Services are provided by approximately 260 utility companies (the "Utilities"). Prior to the Petition Date, the Debtor spent approximately $1,500,000 annually on Utility Services, with an average monthly cost of approximately $120,000.

70.    The Debtor cannot operate without the Utility Services provided by the Utilities, and any disruption could cause significant damage to the Debtor's ongoing business operations and estate. For these reasons, the Debtor must ensure the continued provision of Utility Services.

71.     The Plan proposes to pay all prepetition creditors in full and will not impair any class of creditors. The Debtor submits, and I concur, that the Plan, by itself, thus provides adequate assurance of payment, as all creditors, including Utility Providers, will be paid in full upon the effective date of the Plan. Additionally, the Debtor intends to pay when due all undisputed postpetition charges for Utility Services. The Debtor expects that its available cash will be more than sufficient to pay for such postpetition Utility Services. Nevertheless, in accordance with section 366(c)(1)(A) of the Bankruptcy Code, the Debtor proposes to deposit, for the benefit of the Utilities, a sum equal to 50% of the Debtor's estimated cost of monthly utility consumption – $60,000 – into a newly-created, segregated, interest-bearing escrow account (the "Adequate Assurance Deposit Account") within 20 days of the Petition Date. The Adequate Assurance Deposit Account will be increased in the event that any Utilities are added to the list of Utilities in an amount equal to two weeks of the cost of services provided by such company (based on an annual average). The Debtor also seeks to establish procedures (the "Assurance Procedures") by which a Utility may request Additional Adequate Assurance in the event that it believes the Adequate Assurance Deposit, as well as the other forms of adequate assurance listed above, do not provide it with satisfactory adequate assurance of payment.

72.     Absent an organized procedure for addressing the demands of Utilities for adequate protection, the Debtor may be forced to pay whatever amounts a Utility demands in order to avoid an imminent termination of Utility Services. The Debtor could face a severe liquidity drain if it was forced to pay exorbitantly burdensome or unreasonable deposits as a condition to the provision of Utility Services. The orderly

process contemplated by the Assurance Procedures will avoid such a situation, and thereby enable the Debtor to make a smooth transition into chapter 11, while ensuring the Utilities a fair process for determining the appropriate form of adequate assurance of payment.

73.     Accordingly, I believe the relief requested is necessary and appropriate and is in the best interests of the Debtor's estate, creditors and other parties-in-interest.

G.     Debtor's Motion for an Order Authorizing, but not Directing, the Debtor to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course

74.     By this motion, the Debtor requests authority to honor certain obligations to customers and to otherwise continue certain customer programs and other business practices (collectively, the "Customer Programs") in the ordinary course of business. The Customer Programs include (i) gift cards, (ii) returns, refunds and exchanges, (iii) discounts, (iv) coupons, and (v) a preferred customer program. A large portion of the Customer Programs take the form of merchandise credits or discounts to the Debtor's customers and do not require actual expenditure of the Debtor's funds. The Debtor estimates that, as of the Petition Date, approximately $500,000 is owed by the Debtor on account of the Customer Programs. In addition to continuing the Customer Programs in the ordinary course, the Debtor is seeking an order authorizing and directing banks and other financial institutions to honor and process checks and electronic payment requests related to such payments.

75.     In the extremely competitive retail business, the Debtor has distinguished itself by maintaining high levels of customer service and satisfaction. In furtherance thereof, prior to the Petition Date, in the ordinary course of its business, the

Debtor engaged in certain practices to develop and sustain positive relationships with its customers and in the marketplace for its products. The common goal of the Customer Programs is to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtor, thereby retaining current customers, attracting new ones and ultimately enhancing revenue, margins and profitability. Many, if not all, of these Customer Programs are standard in the retail industry; without their continuance, the Debtor risks surrendering market share to its competitors. Thus, it is essential to the Debtor's business that it be permitted to continue these Customer Programs to effectuate a smooth transition into and through the chapter 11 process. I believe that, absent the relief requested by the Motion, the chapter 11 filing could negatively influence customers' attitudes and behavior towards the Debtor's products. In particular, the Debtor's goodwill and ongoing business relationships likely would suffer if its customers perceive that the Debtor would be unable or unwilling to fulfill the prepetition promises that it has made through the Customer Programs.

76.     Moreover, I believe that the continuation of the Customer Programs, and payment of obligations thereunder, benefit customer development and retention, solidify customer relationships and bolster product sales. Potential purchasers of the Debtor's products have numerous options in the marketplace and will be less likely to purchase the Debtor's products if there is an interruption in any of the Customer Programs. Without the continued support of its customers, the Debtor's business could suffer significant harm.

77.    Accordingly, I believe that granting the relief requested in the Motion is a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

H.    Debtor's Motion for an Order:  (A) Authorizing the Continued Use of Existing Cash Management System, Bank Accounts and Business Forms; (B) Authorizing the Continuation of Certain Intercompany Transactions; and (C) Granting an Interim Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code

78.    By this Motion (the "Cash Management Motion"), the Debtor seeks entry of an order:  (A) authorizing the continued use of the existing consolidated cash management system, bank accounts and business forms; (B) authorizing the continuation of certain intercompany transactions; and (C) granting an interim waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code.

79.    In furtherance of Samsonite's integrated global business operations, and in the ordinary course of its business, Samsonite employs a cash management system (the "Cash Management System") to:  (a) transfer funds between and among its various domestic and foreign affiliates, including the Debtor; (b) allocate costs and revenues among Samsonite's various legal entities; and (c) generally manage Samsonite's operations, cash flow, and cash needs.  Samsonite's treasury department ("Treasury"), situated in Mansfield, Massachusetts, exercises primary oversight of the Cash Management System.  Treasury has integrated the Cash Management System with Samsonite's sales, purchasing, supply and distribution networks, thereby facilitating its cash forecasting and reporting needs, enabling the monitoring, collection and disbursement of funds, and facilitating the administration of the various bank accounts (the "Bank Accounts") required to collect, disburse and effect the movement of cash throughout the system.

80.     The Cash Management System permits the Debtor to: (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds.

81.     The preservation and continuation of the Cash Management System is essential to the Debtor's continued operations. In the ordinary course of business, most of the Debtor's operating expenses, including its employees, suppliers and shippers, are paid by Samsonite. The costs of these goods and services are then allocated to the Debtor through a series of Intercompany Transactions (as defined below) that are recorded and monitored as part of the Cash Management System. In turn, Samsonite sweeps the HSBC Deposit Account (as defined below), which draws funds from the Debtor's various Retail Deposit Accounts (as defined below). Samsonite monitors the Intercompany Transactions and keeps a ledger of all Intercompany Claims (as defined below). To the extent a balance exists after this series of transactions, it is noted in the Debtor's balance sheet. Historically, the Debtor is a net borrower from Samsonite, meaning the costs of goods and services allocated to it exceed the monies swept from the Debtor's bank accounts.

1.     *Company Stores Bank Accounts*

(i)     The Debtor manages its corporate cash primarily through three accounts with HSBC, National Association ("HSBC"): (a) one to collect receivables from the Debtor's various retail distribution channels; (b) one for disbursements for most of the Debtor's centrally-billed corporate payables; and (c) one for the distribution and settlement of sales, use and other similar taxing obligations. The Debtor's receivables are collected through a network of deposit accounts associated with each retail store location.

Cash is swept three times a week from these deposit accounts and centralized in the HSBC retail receipt account (the "HSBC Deposit Account"). Disbursements, in turn, are made from the HSBC disbursement account (the "HSBC Disbursement Account"), which is a zero balance account that is automatically funded daily by Samsonite's HSBC Concentration Account (defined below). Similarly, the sales and use tax account (the "HSBC Tax Account") is a zero balance account that is fully funded by the HSBC Concentration Account.

82. The Debtor operates 173 retail stores in the United States, each of which invoices sales and deposits receipts in its own deposit account (the "Retail Deposit Accounts"). The Debtor has approximately 173 Retail Deposit Accounts located at a variety of national and regional banks. A list of all of the Debtor's Bank Accounts, including the Retail Deposit Accounts, is attached as Exhibit B to the Cash Management Motion.

2. *Samsonite Bank Accounts*

83. The Debtor's deposit and concentration accounts form one part of Samsonite's more extensive global Cash Management System. Samsonite manages its cash primarily through a concentration account at HSBC (the "HSBC Concentration Account"). The Samsonite HSBC Concentration Account sweeps cash from the HSBC Deposit Account daily. The HSBC Concentration Account also funds the Debtor's HSBC Disbursement Account and HSBC Tax Account. Samsonite maintains a variety of receipt, payroll and disbursement accounts at HSBC in order to administer and track the flow of cash throughout the Cash Management System. A schematic outlining the HSBC Concentration Account and the Debtor's other main accounts connected thereto is attached as Exhibit C to the Cash Management Motion.

3.  *Intercompany Transactions*

84.  In the normal course of business, Samsonite, the Debtor, and Samsonite's other non-debtor affiliates engage in various intercompany transactions.  As a result, at any given time, numerous intercompany transactions exist (the "Intercompany Transactions") that reflect intercompany payments and receivables made in the ordinary course between the Debtor, Samsonite, and other non-debtor affiliates (the "Intercompany Claims").  These Intercompany Transactions include, but are not limited to:

(i)  Payroll.  Samsonite funds all of the Debtor's payroll obligations for its 650 employees.  Samsonite books this expense as an Intercompany Claim against the Debtor.

(ii)  Centrally Billed Expenses.  In the ordinary course of business, the Debtor, Samsonite and Samsonite's other non-debtor affiliates incur centrally billed expenses.  These include, for example, centralized invoicing for freight and distribution costs, as well as certain employee medical costs, benefit plans, insurance premiums, taxes and leased equipment.  These charges are allocated among its affiliates, including the Debtor, and are reflected in Intercompany Transactions.

(iii)  Vendors and Suppliers.  Samsonite has centralized its purchasing of manufactured goods, which are primarily sourced from suppliers in Asia and then sold through Samsonite's worldwide distribution network.  As a result, in the ordinary course of business, Samsonite purchases products on behalf of the Debtor and its other non-debtor affiliates, creating an Intercompany Claim.

85.  The Debtor and Samsonite maintain records of Intercompany Transactions and can ascertain, trace and account for Intercompany Transactions between and among themselves, as well as between the Debtor and other of Samsonite's non-debtor affiliates.  These Intercompany Transactions fund the Debtor's essential operating costs, including expenses associated with its employees and vendors.  Continuing these

and other intercompany services will benefit the Debtor's estate. If the Intercompany Transactions were discontinued, a number of services currently provided to the Debtor at reasonable or nominal costs may be disrupted. Accordingly, the Intercompany Transactions are in the best interests of the Debtor's estate and its creditors and should be permitted. The Debtor accordingly seeks authority to continue the Intercompany Transactions postpetition.

86.     The Debtor also seeks a waiver of the U.S. Trustee requirement that its existing bank accounts be closed and new postpetition accounts be opened. If enforced in this case, I believe these requirements would cause enormous disruption in the Debtor's business. Having to open new accounts as of the Petition Date would unnecessarily distract the Debtor's key accounting and financial personnel, whose efforts are more appropriately focused on assisting with the restructuring of the business.

87.     The Debtor also requests that it be authorized to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, and invoices) existing immediately before the Petition Date without reference to the Debtor's status as a debtor-in-possession. Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor-in-possession due to the size and publicity surrounding this case, as well as the overall global restructuring of Samsonite. If the Debtor was required to change its correspondence and business forms, it may be forced to choose standard forms rather than the current forms with which the Debtor's employees, customers and vendors are familiar. Such a change in operations would create a sense of disruption and potential confusion in the Debtor's organization and confusion for the Debtor's customers and vendors.

88.     I believe that the relief requested in this Motion is necessary and appropriate and in the best interests of the Debtor's estate, its creditors and other parties-in-interest.

## **CONCLUSION**

89.     For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this case, I respectfully request that each of the First Day Motions be granted in their entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Date: September 2, 2009

Name: Donald E. Walden

Title: Assistant Treasurer of Samsonite Company Stores, LLC