## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| SAMSONITE COMPANY STORES, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor.[1] | ) | Case No. 09-13162 (___) |
| | ) | |

## DEBTOR'S EMERGENCY MOTION FOR AN ORDER (A) AUTHORIZING THE ASSUMPTION OF THE AGENCY AGREEMENT AMONG THE DEBTOR AND HILCO MERCHANT RESOURCES, LLC, AND (B) AUTHORIZING THE STORE CLOSING SALES

Samsonite Company Stores, LLC ("Company Stores" or the "Debtor"), by and through its undersigned counsel, hereby moves this Court for entry of an order substantially in the form attached hereto as Exhibit A (the "Order") pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") (A) authorizing the assumption of the agency agreement (the "Agency Agreement") among the Debtor and Hilco Merchant Resources, LLC ("Hilco"), and (B) authorizing the Debtor and Hilco to liquidate inventory at certain of the Debtor's retail stores (the "Store Closing Sales") pursuant to the terms of the Agency Agreement and certain sale guidelines attached thereto (the "Sale Guidelines"). In support of this emergency motion (the "Motion"), the Debtor relies upon the *Declaration of Donald E. Walden in Support of the Chapter 11 Petition and Various First Day Applications and Motions* (the "Walden Declaration") filed contemporaneously herewith and incorporated herein by reference, and respectfully states as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

---

[1]      The last four digits of the Debtor's tax identification number are (6266) and its headquarters is located at 575 West Street, Suite 110, Mansfield, MA 02048.

§§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code.

## BACKGROUND

3.      On September 2, 2009 (the "Petition Date") the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor also filed on the Petition Date its Chapter 11 Plan of Reorganization (the "Plan"). In summary, the Plan provides for the rejection of as many as 84 leases, payment in full of all of the Debtor's prepetition claims, reinstating the Debtor's guaranty of its parent's bank debt and unimpairing the Debtor's equity interests. As a result of the treatment of creditors and equity holders, there are no impaired classes of claims or equity interests under the plan and no creditor or equity holder will be required to vote on the Plan for it to be confirmed. Based on these circumstances, the Debtor has requested a hearing on confirmation of the Plan on the earliest date that is convenient for the Court.

4.      Company Stores is a wholly-owned subsidiary of Samsonite Corporation ("Samsonite" and together with its affiliates and subsidiaries, the "Company"). Samsonite is the world's leading travel brand. The Company sells luggage and other travel-related products in more than 100 countries worldwide. The Debtor operates 173 retail stores in the United States in which it sells Samsonite products, as well as those of certain other luggage and travel-related manufacturers. Employing around 650 people, the Debtor realized sales of approximately $108.1 million in 2008. As of July 31, 2009, it had $233 million in total assets and $1.5 billion

in total liabilities.[2]

5.     The Debtor's and Samsonite's financial performance depend primarily on the market demand for Samsonite's products.  The recent downturn in the global economy has resulted in a sudden and dramatic decline in demand for travel-related consumer goods, Samsonite's primary product.  As a result of this decline, both the Debtor and Samsonite have begun to experience liquidity issues.  Facing these issues, Samsonite has spent the last several months negotiating with its primary stakeholders in order to effectuate a company-wide restructuring.

6.     As explained in greater detail in the Walden Declaration, Samsonite, funds managed by CVC Capital Partners ("CVC"), which are the Debtor's ultimate equity owners, and the Royal Bank of Scotland, Plc ("RBS"), the lead agent and majority lender under the Debtor's senior secured credit facility (the "Senior Facility"), recently agreed to a fully consensual out-of-court global restructuring (the "Global Restructuring Agreement") that will significantly reduce the Company's outstanding indebtedness while providing it with sufficient liquidity to meet its projected long-term cash needs.  The filing of this Chapter 11 Case is a condition to and integral part of this global restructuring of Samsonite's operations and de-leveraging of its capital structure.  The Debtor has determined that this Chapter 11 Case, and the exiting from its most unprofitable U.S. retail locations, is the Debtor's best opportunity to successfully and comprehensively reorganize its business affairs in an effort to maximize value for the benefit of the Debtor's collective stakeholders.

---

[2]     The Debtor is a guarantor under the Senior Facility (as defined below) and has pledged substantially all of its assets to secure the obligations related thereto.  The Debtor intends for its guarantee to remain unaltered by the Chapter 11 Case and Plan.  As of July 31, 2009 there was approximately $1.3 billion outstanding under the Senior Facility.

## RELIEF REQUESTED

7.      By this Motion, the Debtor seeks an order (A) authorizing the Debtor to assume the Agency Agreement, and (B) authorizing the Debtor and Hilco to conduct Store Closing Sales pursuant to the terms of the Agency Agreement and the Sale Guidelines.

8.      Prior to the Petition Date, the Debtor undertook extensive efforts to cut costs, streamline operations and increase profitability. To that end, like many retail businesses in the current economic environment, the Debtor determined that it was necessary to close certain underperforming or unprofitable retail stores (the "Closing Stores"). The Debtor's management explored a number of possibilities regarding the timing and structure of the Store Closing Sales, including whether to conduct the Store Closing Sales themselves or to engage a liquidation firm.

9.      In May 2009, the Debtor began soliciting offers from potential liquidation firms to conduct store closing sales at the Closing Stores. To that end, the Debtor obtained confidentiality agreements from 2 national liquidation firms.

10.      After discussions with the liquidation firms, the Debtor received bids from both firms. The Debtor thereafter negotiated with each bidder and ultimately, after evaluating the bids submitted and in the exercise of its sound business judgment, determined that Hilco's bid was the highest and otherwise best bid, and that proceeding with the Store Closing Sales in accordance with the terms of the Agency Agreement was and is in the best interest of the Debtor's estate and its collective stakeholders. Accordingly, on September 1, 2009, the Debtor and Hilco entered into and executed the Agency Agreement.

11.      Pursuant to the Agency Agreement, Hilco will serve as the Debtor's exclusive liquidation agent with respect to the sale of the inventory located at the Closing Stores and certain distribution centers (collectively, the "Merchandise"), as well as certain other furnishings, trade fixtures, equipment and/or improvements to real property located at the

Closing Stores (the "Owned FF&E" and together with the Merchandise, the "Assets"). Hilco will earn a fee based upon the gross recovery from the Debtor's Assets.

           12.    The significant terms of the Agency Agreement are as follows:[3]

(i)    Services: Hilco shall serve as the Debtor's exclusive agent for conducting the Sale and disposing of the Assets, in accordance with the terms and conditions of the Agency Agreement.

(ii)    Guaranteed Amount: Hilco will guarantee the Debtor a minimum recovery of 105% (the "Guaranteed Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"). The Guaranteed Percentage shall be reduced by one and one half percent (1.5%) to the extent the Approval Order is not entered by September 11, 2009. To the extent the Proceeds of the Sale exceed the sum of the Guaranteed Amount, Expenses of the Sale and 6% of the Cost Value of the Merchandise (the "Sharing Threshold"), then all remaining Proceeds shall be shared sixty percent (60%) to the Debtor and forty percent (40%) to Hilco (the "Recovery Amount").

(iii)    Compensation to Hilco: Hilco shall be entitled to all Proceeds of the Sale after payment of the Guaranteed Amount, the Expenses of the Sale, the Recovery Amount, if any, and any other amounts payable to the Debtor from Proceeds of the Sale. Any Merchandise remaining after the Sale Termination Date shall become property of Hilco, free and clear of all liens, claims and encumbrances, and the proceeds received by Hilco from the disposition of such unsold Merchandise shall be considered Proceeds from the Store Closing Sales.

(iv)    Payment: No later than one (1) business day after the later of entry of the Approval Order and execution of the Agency Agreement, Hilco shall pay the Debtor eighty percent (80%) of the Guaranteed Amount. Hilco shall pay the Debtor the unpaid and undisputed balance of the Guaranteed Amount no later than the earlier of (i) the date that is thirty (30) business days after the Sale Commencement Date and (ii) the second business day following the issuance of the audit report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service.

(v)    Sale Term: The Sale shall commence at the Stores on the first calendar day following issuance of the Approval Order, but in no event later than September 18, 2009. Hilco shall complete the Sale at the Stores, and shall vacate all of the Store premises on or before November 30, 2009 unless the Sale is extended by

---

[3]    The summary contained herein is qualified in its entirety by the Agency Agreement and Sale Guidelines, which are attached as Exhibits 1 and 2, respectively, to the proposed Order. If there are any inconsistencies between the summary contained herein and the terms of the Agency Agreement and the Sale Guidelines, the Agency Agreement or Sale Guidelines, as applicable, shall govern. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Agency Agreement or Sale Guidelines.

mutual agreement of Hilco and the Debtor, provided that Hilco may terminate the Sale at any retail store location upon five (5) days' written notice to the Debtor.

(vi)     Terms of Sales to Customers:

      (a)     <u>Final/As Is Sales</u> - All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same. Hilco shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash and nationally recognized bank credit cards.

      (b)     <u>Gift Certificates</u> - Hilco will accept the Debtor's gift certificates and Store credits, issued by the Debtor prior to the Sale Commencement Date, and honor other customer programs required by the Sale Guidelines, including but not limited to all customer satisfaction programs for items purchased prior to the commencement of the Sale as authorized by the Bankruptcy Court (including, but not limited to, acceptance of gift certificates, honoring of customer deposits, and subject to Section 8.5 of the Agency Agreement, granting of refunds for items purchased prior to the commencement of the Sale), to the extent that such programs were in effect at the time the items were purchased by such customers, provided that Hilco shall be reimbursed by the Debtor in connection with the Sale reconciliation contemplated under Section 5.2 of the Agency Agreement on a dollar for dollar basis for any such programs honored by Hilco.

(vii)     <u>Store Closing Sale Expenses</u>:  Hilco shall be unconditionally responsible for all Expenses incurred during the Sale.  Hilco will be responsible for the payment of all Expenses whether or not there are sufficient Proceeds collected to pay such Expenses after payment of the Guaranteed Amount.  To secure payment of the Expenses, Hilco shall deliver to the Debtor an irrevocable and unconditional standby letter of credit, naming the Debtor as beneficiary, in the original face amount equal to two (2) weeks' estimated Expenses.

(viii)     <u>Conduct of the Sale</u>:  Hilco shall be permitted to conduct the Sale in accordance with the Sale Guidelines.  In addition to any other rights granted to Hilco under the Agency Agreement, in conducting the Sale, Hilco, in the exercise of its sole discretion, shall have the right, limited only by the Sale Guidelines:

      (a)     to establish and implement advertising and promotion programs consistent with a "store closing", "sale on everything", "everything must go", or similar theme (including, without limitation, by means of media advertising, A-frame, similar interior and exterior signs and banners, and use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order;

(b) to establish Store hours that are consistent with the terms of applicable leases, and local laws and regulations, including without limitation Sunday closing laws;

(c) except as otherwise expressly included in an Expense, to use without charge during the Sale Term all FF&E, advertising materials, computer hardware and software, existing supplies located at the Stores, intangible assets (including the Debtor's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Debtor located at the Stores (whether owned, leased, or licensed);

(d) to use the Debtor's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale during the Debtor's normal business hours; provided, however, that in the event that Hilco expressly requests the Debtor to provide services other than those normally provided in liquidations such as this to the Stores and relating to the sale of Merchandise by the Debtor, Hilco shall be responsible for the actual incremental cost of such services as an Expense. Hilco shall exercise due care and return to the Debtor immediately at the end of the Sale all materials and supplies except materials and supplies expended; and

(e) to transfer Merchandise between and among the Stores, the costs of which shall be paid by Hilco as an Expense of the Sale; provided, however, Hilco shall not transfer Merchandise between Inventoried Stores unless the Inventory Taking at the transferring and receiving Inventoried Stores has been completed.

(ix) Security Interest: Hilco will have, effective as of the Payment Date, a valid and perfected first priority security interest in and lien upon the Merchandise, Hilco's disposition commission related to Owned FF&E, Hilco's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds to secure all obligations of the Debtor to Hilco thereunder, junior only to (a) an amount equal to the unpaid portion of the Guaranteed Amount, (b) any amount owed by Hilco to the Debtor for Expenses (c) the Recovery Amount, and (d) any other amounts owed by Hilco to the Debtor thereunder. Such security interest shall be valid and perfected without the necessity of filing financing statements to perfect the security interests. The Debtor shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest.

13. The Debtor further requests that the relief requested herein be granted by the Court on an expedited basis. In order for the Debtor to conclude the Store Closing Sales as

quickly and efficiently as possible, and thereby minimize any unnecessary administrative expenses and interruptions with its ongoing business, it is essential that the Debtor start the Store Closing Sales as soon as possible, and in no event later than September 11, 2009. The Debtor will suffer immediate, substantial and irreparable harm if the relief requested herein is not granted on an emergency basis because, among other reasons, pursuant to section 3.1 of the Agency Agreement, the Guaranty Percentage – the percent of the Cost Value of the Merchandise that Hilco pays the Debtor – will be reduced by 1.5% if the Approval Order is not entered on or before September 11, 2009, thereby directly reducing the Debtor's recovery on the Store Closing Sales.

14. Further, any delay in starting the Store Closing Sales will impact Hilco's ability to complete the sales by the Sale Termination Date of November 30, 2009. If the Store Closing Sales are not completed prior to November 30, 2009, then such a delay would have a significant deleterious impact on the Debtor's holiday season sales at its other retail stores that will not be closing. In addition, announcing the Store Closing Sales, but delaying the commencement of such sales, may create unnecessary uncertainty that could impair the Debtor's ability to retain its employees at the Closing Stores and increase the Debtor's exposure to inventory "shrink" in the Closing Stores, which may impact certain inventory thresholds required under the Agency Agreement.

15. In contrast to the harm that any failure to commence the Store Closing Sales before September 11th would undoubtedly cause the Debtor and its estate, the Debtor believes that it will receive significant benefits from commencing the Store Closing Sales before such date. Allowing Hilco, a national organization that is well equipped and regarded as one of the leading experts in the retail liquidation field, to immediately commence the Store Closing

Sales will ensure that (i) the Debtor obtains the maximum recovery on the sale of the Assets, (ii) the Closing Stores will be closed prior to November 30, 2009, thereby avoiding any competition between Closing Stores and go-forward stores in December, a critical retail month, and (iii) will increase the Debtor's likelihood of achieving the Recovery Amount under the Agency Agreement.

16.     Accordingly, the Debtor submits that in order to obtain the highest and best recovery for the sale of Assets, to minimize any negative impact of the Store Closing Sales on the Debtor's other operations and to avoid immediate and irreparable harm, assumption of the Agency Agreement and commencement of the Store Closing Sales should be authorized on an expedited basis.

## BASIS FOR RELIEF

B.     Assumption of the Agency Agreement

17.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(a) of the Bankruptcy Code is intended to allow a debtor to assume those contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *In re Fleming Companies, Inc.*, 499 F.3d 300, 304 (3d Cir. 2007) (section 365 of the Bankruptcy Code enables "the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not"); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000) (same).

18.     The Debtor's decision to assume or reject executory contracts or unexpired leases is a matter within the "business judgment" of the Debtor. *Sharon Steel Corp. v.*

*Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (acknowledging business judgment as the standard for determining whether rejection of a contract is proper); *Nickels Midway Pier, LLC v. Wild Waves, LLC (In re Nickels Midway Pier, LLC)*, 341 B.R. 486, 493 (D.N.J. 2006) ("[a]lthough the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject of a contract, the Third Circuit has adopted the business judgment standard"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("[a] debtor's decision to reject an executory contract under section 365 is governed by the business judgment standard"); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001) (same). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject "was the product of bad faith, whim or caprice." *In re HQ Global Holdings*, 290 B.R. at 511; *In re Trans World Airlines*, 261 B.R. at 120.

19.     As described above, prior to the Petition Date, the Debtor undertook extensive efforts to cut costs, streamline operations and increase profitability. To that end, in May, 2009, the Debtor began soliciting offers from potential liquidation firms to conduct the Store Closing Sales and to liquidate the Assets. The Debtor eventually narrowed its inquiry to two firms, both of which submitted offers. After extensive negotiations and analysis, the Debtor determined, in the exercise of its sound business judgment, that proceeding with the Store Closing Sales in accordance with the terms and conditions of the Agency Agreement with Hilco was in its best interests and the best interests of its collective stakeholders. Accordingly, on September 1, 2009, Hilco and the Debtor executed the Agency Agreement.

20.     In order for the Debtor to conclude the Store Closing Sales as efficiently as possible, and thereby minimize unnecessary administrative expenses, it is essential that the

Debtor be permitted to continue to perform pursuant to the Agency Agreement, including making all required payments thereunder.

21.     For the past several weeks, Hilco has been preparing for the Store Closing Sales, and, accordingly, is familiar with the Debtor's operations in the Closing Stores and how to best optimize the value of the Assets. Hilco is thus in the best position to maximize the value to be obtained by the Debtor during the course of the Store Closing Sales, which will benefit all of the Debtor's stakeholders.

22.     Any failure by the Debtor to continue performing pursuant to the Agency Agreement would in all likelihood lead only to unnecessary delay and expense that would, in turn, disrupt the Debtor's otherwise streamlined reorganization efforts. Among other things, the Debtor and its advisors would have to devote valuable time and effort, at considerable expense to the Debtor and its estate, to locate a new agent to conduct the Store Closing Sales. Given the quick timeline within which the Debtor hopes to conclude the Store Closing Sales and exit from the Chapter 11 Case, it is unlikely that an alternative agent could be found at this stage to undertake the Store Closing Sales on an uninterrupted basis. This would inevitably result in a disruption of the Store Closing Sales and, in all likelihood, a decrease in the Debtor's recovery from the sale of the Assets.

23.     In contrast to the harm that would result from any failure to perform under the Agency Agreement, the Debtor believes that it will receive significant benefits from continuing to perform under the Agency Agreement and from allowing the Store Closing Sales to proceed under Hilco's guidance. As noted above, Hilco was engaged prepetition and has developed substantial knowledge of the Debtor's operations and store practices. Moreover, Hilco is a recognized leader in its field and is well-equipped and experienced to ensure a

maximum recovery on the Assets sold during the Store Closing Sales.

24.     Hilco's extension of credit under the Agency Agreement, and the other financial accommodations of Hilco set forth therein, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of this Court's authorization to consummate the transactions contemplated by the Agency Agreement should not affect the validity of such transactions, unless such authorization and consummation are properly stayed pending appeal.

25.     In closing any transaction contemplated by the Agency Agreement at any time after the entry of an order granting the relief requested herein, Hilco is and shall be deemed to be a purchaser in good faith under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  The Store Closing Sales are being effectuated in good faith within the meaning of section 363(m) of the Bankruptcy Code.

26.     The Debtor submits that the consideration provided by Hilco pursuant to the Agency Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and under the laws of the United States, any state or territory, possession or the District of Columbia.

C.    Store Closing Sales

27.    Section 363(b)(1) of the Bankruptcy Code provides that the debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1); *see also In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that going-out-of-business sales are governed by section 363(b)). To obtain Court approval to use property under section 363(b) of the Bankruptcy Code for the Store Closing Sales, the Debtor must articulate a business reason for the proposed action. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test from *Abbotts Dairies*). When a valid business justification exists, the law vests the debtor's decision with a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990).

28.    There is ample business justification to approve the Store Closing Sales in the instant case. As discussed above and in the Walden Declaration, prior to filing for bankruptcy protection, the Debtor and its advisors undertook an extensive analysis of the costs and benefits of its current number and type of retail store locations and concluded that a significant number of stores, specifically those geared towards "full price" products (as compared to more discount-oriented "outlet" stores) would remain unprofitable for the foreseeable future. For each of the Closing Stores, the Debtor considered the location's

historical performance and costs, as well as projections related to the same. Upon consideration of these factors, and in light of the overall downsizing of Samsonite's business, the Debtor determined the Store Closing Sales were its best opportunity to liquidate the Assets and "rightsize" its operations, thereby maximizing the value of the Debtor's estate. Moreover, the lenders party to the Senior Facility (the "Secured Lenders"), have consented to and fully support the Store Closing Sales and the disposition of their collateral pursuant to such sales.

29.     The Debtor also requests, consistent with the terms of the Agency Agreement, that the sales of the Assets be free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of any entity other than the estate" if any one of the following conditions is satisfied: "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f). As noted above, the Secured Lenders have already consented to the Store Closing Sales, thereby satisfying section 363(f)(2) of the Bankruptcy Code. Furthermore, to the extent there are any entities with an interest on the Assets that have not already consented to the Store Closing Sales, such entity could be compelled to accept a money satisfaction of such interest. Specifically, the Debtor proposes that any liens, claims and encumbrances asserted against the Assets be transferred to any proceeds realized from the sale of such assets, in the same order of priority and subject to the rights, claims, defenses and objections, if any, of all parties with respect thereto.

D. The Court Should Waive Compliance with Any State and Local Laws, Statutes, Rules and Ordinances Restricting Store Closing Sales Solely to the Extent Provided in the Order

30.     Many state and local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation and similar sales. However, by virtue of 28 U.S.C. § 1334 this Court has exclusive jurisdiction over the Debtor's property, wherever located. The Bankruptcy Code preempts state and local laws that conflict with its underlying policies. *See Belculfine* v. *Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd* 112 F.3d 633 (3d Cir. 1997). Preemption is appropriate where, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety. *See Baker & Drake, Inc.* v. *Public Serv. Comm'n of Nev (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

31.     In the instant case, the state and local licensing laws, time limits and other restrictions on liquidation sales would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtor's ability to maximize the value of the Assets for the benefit of its creditors and equity interest holders. Accordingly, authorizing the Store Closing Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and is necessary and appropriate.

32.     It is also necessary that any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere or otherwise hinder consummation of the Store Closing Sales or advertisements relating to such sales be enjoined, to the extent provided in the proposed form of order attached hereto as Exhibit A. *See Missouri* v. *U.S. Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir. 1981), *cert denied*, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing liquidation of grain warehouses violated the automatic stay because it directly conflicted with bankruptcy court's control over property of debtor's estate). The injunctions sought herein shall not limit the ability of any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) from enforcing applicable state and local public health and safety laws ("Safety Laws"), as well as all tax, labor, employment, environmental and consumer protection laws, including consumer laws regulating deceptive practices and false advertising ("General Laws").

33.     The Debtor submits that the requested waiver is narrowly tailored to facilitate a successful consummation of the Store Closing Sales, which will benefit all of the Debtor's collective stakeholders. The Debtor does not seek a general waiver of all state and local law requirements, but only those that apply specifically to liquidation and similar going-out-of-business sales. The Debtor fully intends to be bound by and continue to comply with all Safety and General Laws, unless and until the Court orders otherwise, and will require Hilco to do the same.

34.     Bankruptcy courts in this District and elsewhere have granted similar relief in prior cases. *See, e.g., In re Circuit City Stores, Inc.*, Case No. 08-35653 (Bankr. E.D. Va. Nov. 11, 2008); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 16, 2008); *In re Tweeter Home Entm't Group, Inc.*, Case No. 08-10787 (Bankr. D. Del. July 13,

2007); *In re Three A's Holdings, LLC*, Case No. 06-10886 (Bankr. D. Del. Sept. 25, 2006); *In re MTS Inc.*, Case No. 04-10394 (Bankr. D. Del. Mar. 2, 2004).

E.    The Court Should Waive Any Restriction in the Leases as Unenforceable

35.    Certain of the leases governing the premises of the Closing Stores (the "Leases") may contain restrictive provisions purporting to prohibit the Debtor from conducting store closing, liquidation or similar sales. Such provisions are unenforceable in chapter 11 cases as they constitute an impermissible restraint on the debtor's ability to properly administer its case and maximize value for its assets and stakeholders under section 363 of the Bankruptcy Code. *See, e.g.*, *In re Ames Dep't Stores, Inc.* 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets . . . ."); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that a lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value of the estate and the debtor fulfilled this obligation by holding a store closing sale and closing its store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of its creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced).

36.    Accordingly, to the extent such provisions or restrictions exist in any of the Leases of the Closing Stores, such lessors may not interfere with or otherwise hinder the Debtor and/or Hilco from conducting the Store Closing Sales. The Debtor therefore requests that the Court authorize the Debtor and Hilco to conduct the Store Closing Sales without interference by any lessor or other persons affected, whether directly or indirectly, by such sales.

37.    Bankruptcy Courts in this District and elsewhere have held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable. *See, e.g., In*

*re Circuit City Stores, Inc.*, Case No. 08-35653 (Bankr. E.D. Va. Nov. 11, 2008); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Oct. 16, 2008); *In re Tweeter Home Entm't Group, Inc.*, Case No. 08-10787 (Bankr. D. Del. July 13, 2007); *In re Three A's Holdings, LLC*, Case No. 06-10886 (Bankr. D. Del. Sept. 25, 2006); *In re MTS Inc.*, Case No. 04-10394 (Bankr. D. Del. Mar. 2, 2004).

F.   Abandonment of Certain Property in Connection with Store Closing Sales

38.   During the course of the Store Closing Sales, the Debtor may determine that the costs associated with holding and/or selling certain property exceed the likely proceeds that may derive from any sale of such property. As such, the property is of inconsequential value and may be burdensome to the Debtor's estate. To maximize the value of the Debtor's estate in connection with the Store Closing Sale, the Debtor requests authority under section 544(a) of the Bankruptcy Code to abandon property the Debtor determines to be burdensome, or of inconsequential value or benefit to the Debtor's estate.

39.   Pursuant to the Agency Agreement, the Owned FF&E remaining in the stores at the termination of the Sale Term may be abandoned in place by Hilco and the affected landlord may dispose of such property without liability to them, the Debtor, Hilco or any third party.

G.   Request for Relief under Bankruptcy Rules 6003, 6004(h) and 6006(d)

40.   The Debtor requests that any order approving the relief requested herein be effective immediately, notwithstanding any stay or deferral of relief under Bankruptcy Rules 6003, 6004(h) and 6006(d). As set forth herein, the Debtor will suffer immediate and irreparable harm if the Agency Agreement is not immediately Assumed, and in no event later than September 11, 2009, and the Store Closing Sales are not allowed to proceed expeditiously. For the reasons set forth above, any delay beyond that date will have a significant adverse effect on

the Debtor's recovery from the Store Closing Sales and could materially impact the Debtor's holiday season sales at its other retail locations. Accordingly, the Debtor submits that more than ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

41. In the absence of any person or entity obtaining a stay pending appeal, the Debtor requests authorization for the Debtor and Hilco to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement, and submit that Hilco should be afforded the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agency Agreement if the Order or any authorization contained herein is reversed or modified on appeal.

## NOTICE

42. No trustee, examiner or statutory committee has been appointed in this Chapter 11 Case. Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel: (a) the State Attorney General's offices (upon (i) Chief or Director of the Consumer Protection Division or Bureau; and (ii) Chief or Director of the Bankruptcy Division or Bureau) and State Consumer Protection Agency for each State where a Closed Store or distribution center is located; (b) the local mayor or similar representative of each village or city official and the county or parish where a Closed Store or distribution center is located, addressed to the attention of the municipal, city or county attorney, in each case to the consumer protection division; (c) the Office of the United States Trustee; (d) the Internal Revenue Service; (e) counsel to the agent for Samsonite's prepetition secured credit facility; (f) all parties known to be asserting a lien in the Assets; (g) the Debtor's landlords for the Closed Stores; (h) each of the utilities for the Closed Stores; (i) the state taxing authorities for each state in which the Debtor's

stores are located; and (j) the parties identified on the Debtor's list of twenty (20) largest unsecured creditors. Notice of this Motion and any other order entered herein will be served in accordance with Local Rule 9013-1(m). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

43.     No prior request for the relief sought herein has been made to this or any other court.

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein and such other and further relief as it deems just and proper.

Dated: Wilmington, Delaware    YOUNG CONAWAY STARGATT & TAYLOR, LLP
       September 2, 2009

                */s/ Pauline K. Morgan*
                Pauline K. Morgan (No. 3650)
                Margaret Whiteman Greecher (No. 4652)
                The Brandywine Building
                1000 West Street, 17th Floor
                Wilmington, Delaware 19801
                Telephone: (302) 571-6600
                Facsimile: (302) 571-1253

                - and -

                PAUL, WEISS, RIFKIND, WHARTON &
                GARRISON LLP
                Alan W. Kornberg
                Jeffrey D. Saferstein
                Jacob A. Adlerstein
                1285 Avenue of the Americas
                New York, New York 10019-6064
                Telephone: (212) 373-3000
                Facsimile: (212) 757-3990

                *Proposed Counsel for the Debtor and Debtor-in-Possession*